**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAYMIE GUSTAFSON, on behalf of herself and the putative class,<br><br>c/o Tycko & Zavareei LLP<br>2000 Pennsylvania Ave. NW, Suite 1010<br>Washington, D.C. 20006<br><br>         Plaintiff,<br>    v.<br><br>WASHINGTON NATIONALS<br>BASEBALL CLUB, LLC,<br><br>1500 S. Capitol St., SE<br>Washington, D.C. 20003<br><br>Serve:<br>CT Corporation attn.: Edward L. Cohen<br>1050 Connecticut Avenue, NW<br>Washington, D.C. 20036<br><br>         Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     For years, the Washington Nationals Baseball Club, LLC ("Nationals") systemically cheated customers out of millions of dollars by falsely advertising their ticket prices for baseball games.

2.     Rather than disclosing the full cost of purchasing tickets upfront, the Nationals tacked on last-minute "Service Charges," "Handling and Convenience Charges," "Ticket Processing" charges and "Order Processing" charges that increased the cost of the purchase.

3.     In other words, the Nationals' advertised tickets were not actually available for purchase at the advertised prices.

4.     The goal of the Nationals' false advertising was to convince consumers shopping for baseball tickets that Washington Nationals tickets cost less than their actual price.

5.      These fees—commonly called "Junk Fees," including by the Federal Trade Commission ("FTC")[1]—have recently been the subject of national attention.

6.      Junk Fee practices, like the Nationals', are not just wrong—they are illegal.

7.      On December 17, 2024, the FTC enacted a rule against Junk Fees that prohibits sellers of live-event tickets, such as the Nationals, from "offer[ing], display[ing], or advertis[ing] any price of a covered good or service without clearly and conspicuously disclosing the total price." 16 C.F.R. pt. 464.2(a).[2] To substantiate the need for the rule, the FTC specifically referenced studies showing that "consumers cannot reasonably avoid making errors when the true price is not displayed upfront" and that "consumers who first learn of a lower price do not properly adjust their calculations when additional fees are added, thereby underestimating the total price."[3] The Fees Rule was published in January 2025 and went into effect May 12, 2025. *See* Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2066 (Jan. 10, 2025).

8.      Junk Fees violate the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28–3901, *et seq.*, ("CPPA"), which *requires* businesses to sell goods and services for their advertised prices.

9.      On or about July 2024, the Nationals stopped charging undisclosed Junk Fees, but have not refunded their fans the millions of dollars in Junk Fees that they have been charged.

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed         Nov.         8,         2022),         *available         at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[2] As defined by the FTC, the "total price" of a good or service is the "maximum total of all fees or charges a consumer must pay for any good(s) or service(s) and any mandatory ancillary good or service, except that government charges, shipping charges, and fees or charges for any optional ancillary good or service may be excluded." 16 C.F.R. pt. 464.1.

[3] FTC, *Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2166(II)(B), *available at*  https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees#page-2166.

10.     Plaintiff Gustafson brings this action under the CPPA to hold the Nationals accountable for falsely advertising ticket prices to residents of the District and nationwide and to force the Nationals to pay back the unlawful Junk Fee revenues they have taken from consumers together with statutory penalties and punitive damages.

## JURISDICTION AND VENUE

11.     Pursuant to the Class Action Fairness Act, this Court has original jurisdiction because the aggregate claims of the putative Class Members (defined below) exceed $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a citizen of a state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

12.     This Court has personal jurisdiction over the Defendant because its principal place of business is in the District of Columbia, and it does extensive business in the District of Columbia.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

**A.     Plaintiff Jaymie Gustafson**

14.     Plaintiff Jaymie Gustafson ("Plaintiff Gustafson") is a is a natural person and resident of the District of Columbia. Plaintiff Gustafson purchased tickets from the Nationals to a home game and was charged a Junk fee.

**B.     Defendant Washington Nationals Baseball Club, LLC**

15.     Defendant The Washington Nationals Baseball Club LLC is a limited liability company registered under the laws of the District of Columbia, with its principal place of business in the District of Columbia. Washington Nationals Baseball Club LLC owns and operates the Washington Nationals Major League Baseball team and the Nationals Park baseball stadium.

16.     The Nationals have, at all relevant times, engaged in trade or commerce in the District by advertising, offering, and providing live event tickets online and from their box office in the District to customers nationwide for games played at their stadium in the District.

## FACTUAL BACKGROUND

**A.  Companies Use Junk Fees to Trick Consumers.**

17.     Large, sophisticated companies—like the Nationals—with large, sophisticated marketing departments know that Junk Fees trick consumers into paying more for a good or service than they otherwise would.

18.     Two common types of Junk Fees practices are "drip pricing" and "partitioned pricing," both of which are used by the Nationals to illicitly generate tens, if not hundreds, of millions of dollars in extra (and unearned) profits each year.

19.     **Drip Pricing:** Drip pricing occurs when a company does not disclose the total price of a product or service until late in the purchase process, after consumers have already expended time and effort selecting the product or service and have already committed to a particular purchase.

20.     Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even if continuing to search for a cheaper price would be more "optimal" for them because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[4]

21.     Additionally, consumers are more likely to select higher-quality, more expensive tickets when advertised ticket prices are artificially low due to undisclosed fees. Because many

---

[4] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

Junk Fees are calculated as a percentage of the disclosed price, more expensive tickets often come with higher fees.[5]

22.    Once a consumer decides what to buy, they are unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming their search.[6] In other words, omitting Junk Fees from the advertised cost of a product or service through drip pricing induces consumers to pay a higher total price than they otherwise would have.

23.    One study on a drip-pricing experiment conducted by live-event ticket seller StubHub found that hiding mandatory fees from consumers until checkout increases a company's revenue by approximately 20%.[7]

24.    **Partitioned Pricing:** Partitioned pricing occurs where a portion of the cost for a good or service is excluded from the total price. When Junk Fees are initially "partitioned" from total price, consumers are unable to make effective price comparisons between goods and service leading to distortions in the market. In other words, partitioning Junk Fees makes consumers less likely to "find the most valuable option"[8] when making a purchase.

25.    Making matters worse, consumers exposed to advertising that partitions Junk Fees from the total price are still more likely to underestimate the total price of a given product or service even when the Junk Fees and base price are presented simultaneously,[9] meaning they are further impeded from comparing their options. Consumers are even more likely to underestimate the total price when the font size of the Junk Fee is smaller than that of the base price.[10]

---

[5] Tom Blake, Sarah Moshary, Kane Sweeney, and Steve Tadelis, *Price Salience and Product Choice*, 40 Marketing Science 4, 619-636 (2021), *available at* https://faculty.haas.berkeley.edu/stadelis/AIP.pdf

[6] Sullivan, *supra* note 4, at 17.

[7] Blake, *supra* note 5, at 633.

[8] Sullivan, *supra* note 4, at 23; David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 68 (2020) (Lan Xia and Kent Monroe experiments showed that "price separation may enhance consumers' . . . perceived value . . . and reduce further information search intentions" due to "insufficient price adjustment" (quoting Lan Xia & Kent Monroe, *Price Partitioning on the Internet*, 18 J. Interactive Mktg. 63 (2004)) (cleaned up)).

[9] Sullivan, *supra* note 4, at 21-22.

[10] *Id.* at 25.

26.    A reason that consumers underestimate total price when presented with partitioned pricing is that they will often entirely disregard the Junk Fee altogether because of the cognitive costs and effort involved in adding the partitioned prices. Also, when presented with the task of performing quick mental computation, consumers use the heuristic referred to as "anchoring and adjustment" in which they "overweight the anchor information (e.g., the base price) and adjust insufficiently for the rest of the information (e.g., the [Junk Fee])."[11]

27.    These drip pricing and partitioned Junk Fee practices are not innocuous. When a Junk Fee is hidden and/or partitioned, consumers cannot reasonably compare the cost of a product or service across available options within a company or across companies.

28.    Indeed, as the companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised "base price," and not based on the drip price or partitioned price, especially when the Junk Fee is not adequately disclosed.[12]

29.    Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[13]

30.    As the FTC's Bureau of Economics has explained, the use of deceptively low prices at the outset of transactions while hiding junk fees until the end of the transaction adds steps to

---

[11] *Id.* at 23-24 (in an experiment where "[t]wo groups of high-school students were asked to estimate a numerical expression in five seconds," and "[o]ne group was given the expression 8x7x6x5x4x3x2x1, while the other group was given the same expression in reverse order: 1x2x3x4x5x6x7x8," "[b]oth groups underestimated the total (40,320), but the median estimate given for the descending sequence (2,250) was higher than that of the ascending sequence (512)" (citing Tversky, Amos and Daniel Kahneman (1974), *Judgment Under Uncertainty: Heuristics and Biases*, Science, 185 (September), 1124-31)).

[12] Alexander Rasch et al. *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior    &    Org.    353    (2020),    *available    at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers . . . . based their purchase decision exclusively on the base price."

[13] Rasch et al., *supra* note 12; *see, e.g.*, Shelle Santana, Steven Dallas, Vicki Morwitz, *Consumer Reactions to Drip Pricing*, 39 Mktg. Science 1 (Jan. 15, 2020), at 6 (studies showed that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice").

determining the actual price of a good or service, which forces consumers to pay more than they would if initially presented with full, complete prices. [14]

31.    As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[15]

32.    The FTC has thus characterized Junk Fees as especially egregious when they are hidden (*i.e.*, "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[16]

33.    Given this, it is no surprise companies are motivated to hide Junk Fees through drip and/or partitioned pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees brings in substantial revenue. In 2023 alone, the Junk Fee revenue of the live event industry was approximately $7.14 billion.[17]

34.    In many instances, companies even compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying

---

[14] Sullivan, *supra* note 4, at 2-3.

[15] *Id.* at 4; *see also* Friedman, *Regulating Drip Pricing*, *supra* note 8, at 67 (". . . sellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[16] *See, e.g.*, *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 1 ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

[17] *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition* (March 5, 2024), *available at* https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/

product or service itself.[18] As a result, the product or service appears cheaper to consumers than competitor products or services, even though the total cost of the product or service, inclusive of Junk Fees, is equally, if not more, expensive than those other companies' products or services.[19]

35.     Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[20] In particular, companies are free to charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[21]

36.     Hence, through drip and/or partitioned pricing, companies can charge excessive Junk Fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a Junk Fee and its effect on the total price.

37.     Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip and/or partitioned pricing will lure consumers away from properly behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[22]

38.     Using deceptively low prices and then later adding hidden junk fees also generates significant burden for individual consumers, who "pay upward of twenty percent more [when a company engages in drip pricing] than when the actual price was disclosed upfront."[23]

39.     Put simply, advertising an artificially low price at the outset to lure consumers into the transaction while adding on exorbitant and variable junk fees at the very end is bad for consumers and is bad for competition.

---

[18] *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 1.

[19] *See id.*

[20] Rasch et al., *Drip pricing and its regulation: Experimental evidence*, *supra* note 12.

[21] *Id.* ("firms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

[22] *Id.* (". . . where there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[23] *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* note 1

**B.      The FTC and State Attorneys General Are Stepping Up Against Drip Pricing.**

40.      The conduct of drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce").

41.      The FTC's guidance on bait and switch advertising has long stated that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

42.      More recently, the FTC's Trade Regulation on Unfair or Deceptive Fees, which took effect in May 2025, declares that "it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets . . . without clearly, conspicuously and prominently disclosing the total price," and authorizes the FTC to seek civil penalties against companies that violate the FTC Act in this way.[24]

43.      According to former President Joseph Biden in announcing the ban, Junk Fees often add as much as 20% to the advertised price—which is "wrong . . . it's just taking advantage of people."[25] "It's just about simple fairness. [F]olks are . . . tired of being taken advantage of."[26] "These junk fees may not matter to the wealthy. But they sure matter to working folks in homes like the one I grew up in."[27]

44.      In sum, separating Junk Fees that consumers are obligated to pay in order to purchase a ticket from advertised ticket prices without first disclosing the total price harms consumers by artificially increasing the search costs and the cognitive costs of finding and purchasing tickets to sporting events. Unless the total price is disclosed upfront, consumers are not

---

[24] FTC, *Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2166, Summary, *supra* note 3.

[25] *President Biden speaks on FTC's proposed junk fee ban, YouTube (Oct. 11, 2023), https://www.youtube.com/watch?v=1TiAhSlS8W0.*

[26] *Id.*

[27] *Id.*

reasonably able to make an informed decision on which product or service would be most favorable for them to purchase.

45.    Seeking to protect consumers from this harm, state Attorneys General have brought enforcement actions to stop Junk Fee practices. For example, in 2019, then District of Columbia Attorney General Karl A. Racine, on behalf of District consumers sued Marriott International, Inc. for hiding the true price of hotel rooms from consumers and charging hidden resort fees to increase profits. The suit alleged that Marriott's deceptive and misleading pricing practices and failure to disclose fees harmed consumers and violated the District's consumer protection laws.[28]

46.    Also, in 2024, the Attorney General for the District of Columbia filed a lawsuit against StubHub, Inc., under the CPPA, "for hiding the true price of tickets from consumers and charging hidden fees to increase profits."[29] Other Attorneys General and the FTC have brought similar actions against corporations for inducing consumers to make purchases that are not cost effective, while the companies gain millions.[30]

---

[28] *AG Racine Sues Marriott for Charging Deceptive Resort Fees and Misleading Tens of Thousands of District Consumers*, Office of the Att'y Gen. of D.C. (July 9, 2019), https://oag.dc.gov/release/ag-racine-sues-marriott-charging-deceptive-resort

[29] *Attorney General Schwalb Sues StubHub for Deceptive Pricing & Junk Fees*, Office of the Att'y Gen. of D.C. (July 31, 2024), https://oag.dc.gov/release/attorney-general-schwalb-sues-stubhub-deceptive; Compl. for Violations of the Consumer Prot. Procedures Act, *District of Columbia v. StubHub, Inc.* (D.C. Super. Ct.), at 3 ¶¶ 4-5, *available at* https://oag.dc.gov/sites/default/files/2024-07/2024.07.29%20DC%20OAG%20StubHub%20Complaint%20-%20to%20finalize_Redacted%20%281%29.pdf ("StubHub entices consumers to shop for tickets by displaying deceptively low prices that do not include StubHub's mandatory fees—the bait. Only after a consumer has chosen tickets and invested time and effort . . . does StubHub reveal the mandatory fees added to the ticket price—the switch").

[30] *See, e.g.*, Amended Complaint for Injunctive and Other Relief, https://ago.nebraska.gov/sites/ago.nebraska.gov/files/doc/2019.07.24_Hilton%20Dopco%20Inc._Amended%20Complaint.pdf (Nebraska suit against hotel chain Hilton for "drip pricing" whereby consumers are "misled or confused concerning the true cost of an overnight stay"); Complaint for Permanent Injunction, Monetary Judgment, Civil Penalty Judgment, and Other Relief, https://www.ftc.gov/system/files/ftc_gov/pdf/greystar_complaint_-_filed.pdf (Colorado and FTC suit against multifamily property manager Greystar for "charging 'Hidden Fees'" and "misrepresent[ing] the true cost of renting a unit at its properties."); Complaint, https://portal.ct.gov/-/media/ag/press_releases/2024/altice---complaint---51124_redacted.pdf

47. Despite the substantiated harms to consumers, the Nationals have not refunded anyone who paid hidden Junk Fees to purchase tickets.

**C.    The Nationals' Deceptive Junk Fee Advertising.**

48. Until recently, the Nationals did not include Junk Fees in its advertised ticket prices for in-person or online sales. By doing so, the Nationals misrepresented and concealed the actual cost of tickets from consumers.

49. As seen below, the Nationals maintained a color-coded seat map for the price of tickets. Usually, all tickets of the same color were advertised for the same price even in different sections. As seen below, tickets in the dark-blue sections were $13.

50. But the Nationals were not willing to sell tickets for the advertised prices. In fact, as illustrated below, the $13 ticket actually cost a consumer $20.75 at checkout, or a whopping 59.6% more than the advertised price.

51. Undoubtedly, the Nationals charged undisclosed Junk Fees to deceive consumers into purchasing higher-priced tickets with higher fees, and to therefore increase their revenues without appearing to raise the price of tickets.

52. As a result, the Nationals concealed the actual cost of their tickets, misleading consumers and tricking them out of their hard-earned money.

**1.    The Nationals Charged Hidden Junk Fees to Consumers Who Purchased Washington Nationals Tickets at the Box Office**

53. The Nationals charged undisclosed Junk Fees to consumers who purchased tickets in-person at the Nationals Park Box Office, located in the District.

54. The Nationals did not display ticket prices prominently at the Box Office. The only permanent signage at the Box Office shows the seating sections of Nationals Park but does not indicate how much a ticket for a certain section will cost.

---

(Connecticut suit against internet service provider Altice USA for "advertis[ing] a price for Internet Service that did not include [a Junk Fee] but actually charg[ing] many of its Connecticut customers a higher price.")

55.    Many consumers who purchased tickets at the Box Office had previously viewed the Nationals' advertised ticket prices online. Because these prices did not include Junk Fees, and because the Junk Fees were not disclosed at the Box Office, these consumers had no way of knowing the actual price of their ticket before checkout.

56.    Although the Nationals did eventually provide consumers the total price for their transaction, it was only revealed after consumers had already invested time into going to the Box Office, waiting in line, reviewing the available seat options, and deciding which seat(s) to purchase. Upon information and belief, although fans may have been told the final total price for their transaction, they were routinely not told that the increase in price was due to Junk Fees rather than legitimate government-mandated tax or fees.

57.    A fan who wanted to change their mind after finding out about the increase in price would have to start the buying process all over again while standing in front of a line of other fans.

58.    Because of the Nationals' deceptive Junk Fee practices, an in-person consumer could not reasonably compare the total price of one ticket against the price of another ticket for a different seat or a ticket sold by another seller.

**2.    The Nationals Charged Hidden Junk Fees to Consumers Who Purchased Tickets Online**

59.    When a consumer searched for tickets on the National's official website https://www.mlb.com/nationals, the consumer received a variety of potential game options with purported lowest ticket pricing information, including for a Washington Nationals vs. Atlanta Braves game held at Nationals Park on September 21, 2023:



60.     As shown in the image above, the advertised lowest price for a ticket to the September 21, 2023 game was $13.00. However, the Nationals did not actually sell tickets to this game for $13.00.

61.     Even when a consumer clicked "Buy Tickets," they were still not presented with an accurate and complete ticket price that included the Junk Fees. The consumer was instead led to a page that showed tickets available for $13.00 - $490.00. This advertised price range did not include Junk Fees:



62.     Due to this drip pricing, consumers could not search for tickets within their desired price range because the full price was not displayed.

63.     When a consumer selected a section of seating on the screen above, they were taken to the next page where they could view prices for tickets within that section—exclusive of Junk Fees:



64.     Once a consumer selected a seat, they were prompted to sign in or create an account on mlb.com, or continue as guest.

65.     After a consumer signed into their account or chose to continue as guest, they were taken to a timed checkout screen. At the top of the checkout screen, the Nationals showed the ticket price exclusive of Junk Fees in larger, bolded font—here, $13.00. Consumers then had to scroll through options to purchase parking, make a donation, select their delivery method, select their payment method, enter payment details, and indicate their messaging preferences.

66.     Only once consumers finally reached the bottom of the page did the Nationals disclose the true total price—$20.75. This price included a $3.75 "Ticket Processing" fee and a $4.00 "Order Processing" fee.

67.     A consumer who was lured in by the Nationals' initial advertised price of $13.00 would ultimately be made to pay nearly 60% more.



68.     Nowhere during the purchase flow did the Nationals explain the purpose of the "Ticket Processing" fee or the "Order Processing" fee, or how those fees were calculated.

69.     To make matters worse and to add pressure to further interfere with user decision-making, in the upper right corner of the page, the Nationals include a countdown clock. In the approximately 30 minutes the countdown clock runs, consumers (1) must review all of the information on the checkout screen regarding fees and add-on items, such as parking, ticket delivery, and donations, (2) must add their payment information (3) are expected to read and agree to Defendants' "Terms & Conditions," which, if printed on standard 8.5"x11" paper would total eight pages, and (4) must notice and understand the increase in the cost of their tickets. The countdown clock adds pressure designed to interfere with consumers' decision making and ensures that users are rushed to complete the purchase—despite the exorbitant fees tacked on at the end of the transaction after consumers are well down the path to purchase.

70.     Though the Nationals finally provided a "Total Amount Due," it is at the bottom of the last page of the purchase process, at which time a consumer has already invested time and effort into selecting and purchasing a ticket, and has already psychologically committed to the ticket.

71.     Because of the Nationals' deceptive Junk Fee Practices, the Nationals would advertise a price (such as $13.00) at which they did not intend, and were not willing, to sell the ticket. And because of these deceptive Junk Fee practices, an online consumer could not reasonably compare the total price of one ticket against the price of another ticket for a different seat or a ticket sold by another seller.

***

72.     For these reasons, the Nationals' presentation of their Junk Fees is an unfair and deceptive trade practice.

73.     During the purchase process, the Nationals advertised a ticket price that did not include Junk Fees. Even when they finally disclosed the Junk Fees at the end of the process, the

16

Junk Fees were partitioned from the ticket price. Although the Junk Fees were not conspicuously disclosed, consumers could not purchase a ticket either online or in-person without paying Junk Fees to the Nationals.

**D.    Plaintiff Gustafson's Experience**

74.    On May 1, 2023, Plaintiff Gustafson traveled to Nationals Park. Once there, Plaintiff Gustafson went through the Nationals Park Box Office line.

75.    When she reached the box office, she was quoted ticket prices in round numbers consistent with the Nationals' color-coded advertised prices. She was not informed of the existence or amount of ticket fees over the quoted amount.

76.    Plaintiff Gustafson purchased two tickets.

77.    Plaintiff Gustafson did not learn that she was charged a higher amount until she looked at her credit card statement and saw that she was charged $34.30 rather than the advertised price.

78.    The Nationals did not advertise a price that included all mandatory fees.

79.    The price was a substantial factor in Plaintiff Gustafson's decision to purchase the specific tickets that she purchased.

80.    Plaintiff Gustafson paid more for the tickets than she otherwise would have as a result of the Nationals' practices described herein.

## THE DISTRICT'S CONSUMER PROTECTION PROCEDURES ACT

81.    The District of Columbia Consumer Protection Procedures Act protects consumers from a wide range of unfair and deceptive business practices. *See* D.C. Code § 28–3904.

82.    Consistent with these protections, CPPA Section 28–3901(c) directs courts to construe the CPPA broadly "to promote its purpose," including ensuring that "a just mechanism exists to remedy all improper trade practices" and promoting "through effective enforcement[] fair business practices throughout the community." D.C. Code §§ 28–3901(c), (b)(1), (2).

83.    Among other things, the CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased,

leased, or received in the District of Columbia," D.C. Code § 28–3901(c), and makes it unlawful to "advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered" and "make false or misleading representations of fact concerning . . . the price in comparison to [the] price of [a] competitor['s]," D.C. Code §§ 28–3904(h), (j).

84.    CPPA Section 28–3904 is explicit that a violation occurs regardless of "whether or not any consumer is in fact misled, deceived, or damaged" by the unlawful practice.

85.    Where a violation is found, the CPPA provides for statutory damages of $1,500 *per violation*, among other relief. D.C. Code § 28–3905(k)(2)(A)(i).

## CLASS ALLEGATIONS

86.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including Sections (b)(1), (b)(2) and (b)(3) of Rule 23.

87.    Plaintiff Gustafson seeks certification of the following nationwide class (the "**Nationwide Class**"), consisting of the following individuals:

All individuals in the United States who purchased a ticket from Defendant at the Nationals Park Box Office, through the MLB Ballpark app, or through the desktop or mobile versions of mlb.com prior to July 16, 2024, and who paid a service fee, handling and convenience fee, ticket processing fee, order processing fee, and/or other similar fee to Defendant.

88.    The Nationals' deceptive Junk Fee practices violated each Class members' individual statutory right to truthful information from the Nationals about the actual price of live event tickets purchased, leased, or received in the District of Columbia.

89.    The Nationals' deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of the Nationals' drip and/or partitioned Junk Fee practices.

90.    Plaintiff Gustafson explicitly reserves her right to amend, add to, modify, and/or otherwise change the proposed class definitions as discovery in this action progresses.

91.    The following people are excluded from any of the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

92.    **Numerosity.** Plaintiff is informed and believes that there are hundreds of thousands of members of the Class. The Class is so large that the joinder of all of their members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of the Nationals.

93.    **Commonality.** The Nationals have acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the sought relief creates the possibility of inconsistent judgments and/or obligations imposed on the Nationals. Many common issues of fact and law exist, including, without limitation:

a.    Whether the Nationals' drip and/or partitioned Junk Fee practices are a trade practice under the CPPA;

b.    Whether live event tickets are consumer goods or services under the CPPA;

c.    Whether the Nationals' offer, lease, and/or sale of live event tickets renders it a merchant under the CPPA;

d.    Whether the Nationals' advertising, or causing of advertising by third parties, of prices for live event tickets that do not include Junk Fees constitutes an advertisement or offer without the intent to sell the tickets as advertised, which is an unlawful trade practice that violates the CPPA (D.C. Code § 28–3904(h));

e.  Whether the Nationals' drip and/or partitioned Junk Fee practices constitute a "misrepresent[ation] as to a material fact which has a tendency to mislead" (D.C. Code § 28–3904(e));

f.  Whether the Nationals' drip and/or partitioned Junk Fee practices "fail to state a material fact" that "tends to mislead" (D.C. Code § 28–3904(f));

g.  Whether the Nationals' drip and/or partitioned Junk Fee practices "use innuendo or ambiguity as to a material fact, which has a tendency to mislead" (D.C. Code § 28–3904 (f-1)); and

h.  Whether the Nationals' drip and/or partitioned Junk Fee practices "make false or misleading representations of fact concerning . . . the price in comparison to price of competitors or one's own price at a past or future time," (D.C. Code § 28–3904 (j)).

94.  **Predominance.** These common issues predominate over individualized inquiries in this action because the Nationals' liability can be established as to all members of the Class.

95.  **Typicality.** Plaintiff Gustafson's claims are typical, if not identical, to the claims that could be asserted by all members of the Class they seek to represent and arise from the Nationals' practices applicable to all such Class members. Their claims all arise from the Nationals' deceptive Junk Fee practices applicable to all such Class members and are based on the same legal theory as to how and why those practices violate the CPPA. *See Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 40 (D.D.C. 2017) ("typicality focuses on the similarities between the class representative's claims and those of the class").

96.  **Adequacy.** Plaintiff Gustafson is a member of the Class she seeks to represent and will adequately represent the interests of those Class members because there are no conflicts between Plaintiff and those Class members, and because Plaintiff's counsel has the experience and skill to zealously advocate for the interests of the members of the Class.

97.  **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members

of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the alleged conduct; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff knows of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

98.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## COUNT I
### Violation of the Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.*
### On Behalf of the Class

99.    The allegations of Paragraphs 1 through 98 are re-alleged as if fully set forth herein.

100.    The D.C. Consumer Protection Procedures Act is a remedial statute that is to be broadly construed. It establishes "an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." D.C. Code § 28–3901(c). CPPA Section 28–3904 is explicit that a violation occurs regardless of "whether or not any consumer is in fact misled, deceived, or damaged" by the unlawful practice.

101.    The CPPA prohibits unlawful trade practices in connection with the offer, sale, advertisement, and supply of consumer goods and services. D.C. Code § 28–3904.

102.    The tickets the Nationals offers to consumers are leased or sold for personal, household, or family purposes and, therefore, are consumer goods or services.

103.    The Nationals, in the ordinary course of business, offers to lease, sell, or supply consumer goods and services and, therefore, are a merchant. D.C. Code § 28–3901(a)(3).

104.    The Nationals' advertising of prices for tickets that do not include Junk Fees that were then charged as a prerequisite to purchasing tickets constitutes an advertisement or offer

without the intent to sell the tickets as advertised, which is an unlawful trade practice that violates the CPPA, D.C. Code § 28–3904(h).

105.    Because cost is a material fact to consumers deciding whether to purchase a ticket and because drip and partitioned pricing misrepresent the price of a ticket and total cost to the consumer, through this conduct the Nationals engaged in unfair and/or deceptive trade practices by "misrepresent[ing] . . . a material fact which has a tendency to mislead," D.C. Code § 28–3904(e), "fail[ing] to state a material fact" and "such failure tends to mislead," D.C. Code § 28–3904(f), "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead," D.C. Code § 28–3904(f-1), and/or "mak[ing] false or misleading representations of fact concerning . . . the price in comparison to price of competitors or one's own price at a past or future time," D.C. Code § 28–3904(j).

106.    The Nationals' deceptive Junk Fee practices violated each Class member's individual statutory right to truthful information from the Nationals about the actual price for tickets purchased, leased, or received in the District of Columbia.

107.    Class members suffered actual injuries as a result of the Nationals' unfair and deceptive practices in the amount of the Junk Fees that consumers were required to pay in order to purchase a ticket which were not included in the advertised price but were paid.

108.    Class members were also injured by having to spend more time searching for full pricing information or by having to make uninformed decisions.

109.    Each ticket that the Nationals sold without disclosing Junk Fees in the initial advertisement constitutes a violation of the CPPA.

110.    Given these practices, Plaintiff Gustafson and the Class members are also entitled to injunctive relief. D.C. Code § 28–3905(k)(2)(D).

111.    WHEREFORE, Plaintiff Gustafson respectfully requests the following relief:

    a.    An order certifying the proposed classes pursuant to Federal Rule of Civil

    b.    Procedure 23 and appointing Plaintiff and their counsel to represent them;

c. Award the Class members treble damages of the actual damages as provided in the CPPA, or statutory damages of $1,500.00 per violation, whichever is greater;

d. Award Plaintiff Gustafson and the Class members punitive damages as determined by the trier of fact as the Nationals' actions were replete with malice and were accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, and willful disregard of the Class members' rights as described above;

e. Award Plaintiff Gustafson and the Class members reasonable attorneys' fees and costs as provided in the CPPA;

f. Grant any additional relief as may be necessary to restore to the Class members money which may have been acquired by means of the Nationals' unlawful trade practices pursuant to D.C. Code 28–3905(k)(2)(E) including, but not limited to, disgorgement; and

g. Grant Plaintiff Gustafson and the Class members other and further relief as the Court finds necessary and proper.

## JURY DEMAND

112. Plaintiff Gustafson demands a trial by jury.


Date: September 5, 2025

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei (DC Bar No. 456161)
F. Peter Silva II (DC Bar No. 1010483)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, D.C. 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*hzavareei@tzlegal.com*
*psilva@tzlegal.com*

*Counsel for Plaintiff and the Putative Class*