**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **JAYMIE GUSTAFSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-cv-03033 (APM)** |
| | ) | |
| **WASHINGTON NATIONALS** | ) | |
| **BASEBALL CLUB, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

Plaintiff Jaymie Gustafson, on behalf of herself and a putative class, alleges Defendant Washington Nationals Baseball Club, LLC falsely advertised its ticket prices in violation of the D.C. Consumer Protection Procedures Act (CPPA).  The National Consumers League ("NCL"), which has filed a similar lawsuit in D.C. Superior Court, moves to intervene for the purpose of seeking a stay while the Superior Court suit runs its course.  *See* Intervenor-Pl. NCL's Mot. to Intervene and to Stay, ECF No. 8 [hereinafter NCL's Mot.].  At the same time, Defendant moves in the instant case to compel arbitration or, in the alternative, to dismiss the complaint for lack of standing.  *See* Def.'s Mot. to Compel Arbitration or, in the Alternative, to Dismiss the Compl., ECF No. 12 [hereinafter Def.'s Mot.].

For the reasons that follow, the court grants in part and denies in part NCL's motion. The court will allow NCL to intervene but denies its request for a stay.  The court largely denies Defendant's motion, except that it dismisses Plaintiff's request for injunctive relief for lack of standing.

## II.    BACKGROUND

### A.    Factual Background

At this stage, the court recites the facts as alleged in the complaint.  *See Jawad v. Gates*, 832 F.3d 364, 366 (D.C. Cir. 2016) (applying this principle to a motion to dismiss); *Riley v. BMO Harris Bank, N.A.*, 61 F. Supp. 3d 92, 95 (D.D.C. 2014) (applying this principle to a motion to compel arbitration).

Plaintiff alleges that Defendant charges for its tickets additional "Junk Fees," or "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer or fees that are hidden, such as those disclosed only at a later stage in the consumer's purchasing process or not at all."  Compl., ECF No. 1 [hereinafter Compl.], ¶ 5 & n.1 (internal quotation marks omitted).  She alleges that, "[r]ather than disclosing the full cost of purchasing tickets up front, the Nationals tacked on last-minute 'Service Charges,' 'Handling and Convenience Charges,' 'Ticket Processing' charges and 'Order Processing' charges that increased the cost of the purchase."  *Id.* ¶ 2.  "The goal," Plaintiff alleges, "was to convince consumers shopping for baseball tickets that Washington Nationals tickets cost less than their actual price."  *Id.* ¶ 4.  As a result, consumers are unaware of the fees or, if they become aware, are "unlikely to depart from" their decision to buy tickets later in the purchasing process "because of the 'additional cognitive effort' involved in resuming their search" and thereby pay more for the tickets than they otherwise would have.  *See id.* ¶¶ 22, 38 (citation omitted).

On May 1, 2023, Plaintiff went to Nationals Park to purchase tickets at the box office.  *Id.* ¶ 74.  The box office attendant "quoted ticket prices in round numbers" that matched those on color-coded maps of the stadium's seating sections.  *Id.* ¶¶ 49, 54, 75.  The attendant did not tell Plaintiff that she would have to pay fees on top of the ticket price.  *Id.* ¶ 75.  Plaintiff purchased

two tickets and did not learn that she had been charged more than the quoted price until she later looked at her credit card statement. *Id.* ¶¶ 76–77. She notes that "[t]he price was a substantial factor in [her] decision to purchase the specific tickets that she purchased." *Id.* ¶ 79.

Plaintiff alleges that she was not the only consumer subject to Defendant's junk-fee practices at the box office. *See id.* ¶¶ 53–58. She notes that, while Defendant "did not display ticket prices prominently at the Box Office," "[m]any consumers who purchased tickets at the Box Office had previously viewed the Nationals' advertised ticket prices online." *Id.* ¶¶ 54–55. But "[b]ecause these prices did not include Junk Fees, and because the Junk Fees were not disclosed at the Box Office, these consumers had no way of knowing the actual price of their ticket before checkout." *Id.* ¶ 55; *see also id.* ¶¶ 56–57.

Although Plaintiff does not allege that she purchased tickets online, she alleges that those who did were also subject to Defendant's junk-fee practices. While Defendant's official website would display a ticket price exclusive of fees up front, Defendant would later include additional processing fees that were not displayed until the consumer went through the purchase flow and reached the bottom of the final checkout screen. *See id.* ¶¶ 59–71.

Defendant has since "stopped charging undisclosed Junk Fees." *Id.* ¶ 9.

## B.    NCL's Lawsuit

On July 16, 2024, NCL filed a complaint in D.C. Superior Court alleging violations of the CPPA "in connection with certain of the Nationals' ticket sales practices." NCL's Mot., Ex. A., ECF No. 8-1 [hereinafter NCL Compl.], at 1. NCL alleged that, "[i]nstead of disclosing the true, total price of the relevant tickets, the Nationals misleadingly omit the existence and amount of per-ticket fees that they choose to impose." *Id.* ¶ 2. Although focused more heavily on online purchases, the factual allegations are similar to those in Plaintiff's complaint. *See generally id.*

3

The Nationals both moved to dismiss and to compel arbitration. The Superior Court denied both motions. NCL's Mot., Ex. C, ECF No. 8-3, ¶ 4. The Nationals appealed the latter decision, and the court stayed the case pending appeal. Pl.'s Opp'n to NCL's Mot., ECF No. 14 [hereinafter Pl.'s Opp'n to NCL's Mot.], Ex. A, ECF No. 14-1 [hereinafter Stay Order].

### C.      Procedural History

Plaintiff filed this lawsuit on September 5, 2025, seeking both damages and injunctive relief. *See* Compl. ¶¶ 110–111. Shortly thereafter, NCL moved to intervene. *See* NCL's Mot. Pointing to the "significant progress" made in the Superior Court lawsuit, NCL asks this court to stay the case to avoid potentially inconsistent rulings and what it views as the possibility of "a collusive settlement intended to sidestep the bulk of the monetary damages sought in NCL's case." *Id.* at 1. Both Plaintiff and Defendant oppose the motion. *See* Def.'s Mem. of P. & A. in Opp'n to NCL's Mot., ECF No. 13 [hereinafter Def.'s Opp'n to NCL's Mot.]; Pl.'s Opp'n to NCL's Mot.

Around the same time, Defendant moved to compel arbitration or, in the alternative, to dismiss this case. *See* Def.'s Mot. Defendant primarily argues that a binding arbitration clause contained in the terms and conditions of use for both its website and Major League Baseball's Ballpark mobile application requires Plaintiff to arbitrate her claim. *Id.* at 1. In the alternative, Defendant moves to dismiss, asserting that Plaintiff lacks standing because "her purported injury would not be traceable to the allegedly unlawful conduct of which she now complains." *Id.* at 2.

### III.    DISCUSSION

The court begins, as it must, with standing. *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012). Although Defendant filed its motion after NCL's, if Defendant prevails on this "threshold jurisdictional question," *id.*, the court must dismiss the case and need not consider NCL's request to intervene. The court concludes Plaintiff has standing, so

it then addresses the merits of NCL's motion to intervene and stay the case before finally returning to Defendant's motion to compel arbitration.

### A.   Standing

The "irreducible constitutional minimum of standing" has three elements: (1) a "concrete and particularized" injury in fact; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). It is the plaintiff's burden to demonstrate standing. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). When a defendant moves to dismiss for lack of standing, the court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor." *Id.* Viewing the complaint in this light, Plaintiff has demonstrated standing with respect to her claim for damages but not for injunctive relief.

Start with the claim for damages. Plaintiff alleges that, because of undisclosed fees, she paid more than the amount quoted by the box office attendant. Compl. ¶¶ 74–78. "Bait-and-switch" pricing schemes like the one Plaintiff alleges "can inflict a concrete injury on consumers by causing them to either spend more time searching for full pricing information or make uninformed decisions." *Hettinger v. Bozzuto Mgmt.*, No. 23-cv-3687 (JEB), 2025 WL 2029747, at *12 (D.D.C. July 21, 2025) (cleaned up). And "[t]he injury is even more concrete in this case" because the resulting overpayment is a "classic pocketbook injury." *See id.*; *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023). The injury is also "fairly traceable" to Defendant's conduct, *Arpaio*, 797 F.3d at 19, as the failure to disclose the additional fees up front both deprived Plaintiff of full information and caused Plaintiff to overpay: Plaintiff alleges that the advertised price was "a substantial factor in [her] decision to purchase the specific tickets that she purchased," Compl.

5

¶ 79.  Lastly, "[a] damage claim, by definition, presents a means to redress an injury." *Cardenas v. Smith*, 733 F.2d 909, 914 (D.C. Cir. 1984).  Plaintiff has therefore met all three standing requirements as to her damages claim.

Defendant contends that Plaintiff falls short of alleging causation.  *See* Def.'s Mot., Mem. of P. & A. in Supp. of Def.'s Mot., ECF No. 12-1 [hereinafter Def.'s Mem.], at 24–26; Reply Mem. of P. & A. in Supp. of Def.'s Mot., ECF No. 20 [hereinafter Def.'s Reply], at 19–21. Defendant relies primarily on *Woodford v. Yazam Inc.*, No. 22-cv-3665 (BAH), 2023 WL 8083975 (D.D.C. Nov. 21, 2023), a CPPA case in which the court concluded the plaintiff had not adequately pleaded causation because the plaintiff did not "allege that she reviewed, let alone relied" on the alleged misrepresentations, *id.* at *5.  Defendant says Plaintiff's claim fails for the same reasons. As to her awareness of the alleged junk fees, Defendant seizes on Plaintiff's allegation that "many consumers"—though not Plaintiff herself—"who purchased tickets at the Box Office had previously viewed the Nationals' advertised ticket prices online."  Compl. ¶ 55.  Defendant argues that, "[t]o the extent Plaintiff is relying on others' use of the [w]ebsite, rather than Plaintiff's own use," Plaintiff cannot show causation because she does not "specifically allege whether she reviewed those advertised prices before her purported box office purchase."  *See* Def.'s Mem. at 25–26.  But whether Plaintiff saw the prices advertised on Defendant's website is immaterial.  Her individual claim does not rest on website representations.  Instead, it depends on the delta between the price quoted at the box office—the falsely advertised price—and the amount paid.  *See* Compl. ¶¶ 74–80.  Thus, unlike the plaintiff in *Woodford*, Plaintiff here "reviewed" the alleged misrepresentation when she received a quoted ticket price that did not include junk fees.[1]

---

[1] To the extent questions arise from Plaintiff's alleging website-caused injuries for others in the putative class but not herself, those are more appropriately resolved at the class certification stage.  *See* Fed. R. Civ. P. 23(a) (requiring a putative class representative to show, among other requirements, that their claims are typical of those in the class).

As for reliance, "the CPPA itself does not require that the consumer detrimentally relied *at all* on the misrepresentation," *Hettinger*, 2025 WL 2029747, at *12 (first citing D.C. Code § 28-3904; then citing *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 664 (D.C. 2024)), let alone demand a showing that Plaintiff "would not have purchased the Nationals' tickets had she been made aware of the purported misrepresentations prior to her purchase," Def.'s Reply at 19. True, the mere availability of a right to sue cannot displace the constitutional requirements of standing, *see Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016), so Plaintiff must show *some* causal connection between Defendant's conduct and her injury.  *See* Def.'s Mem. at 24 (citing *Woodford*, 2023 WL 8083975, at *4).  But that causal link need not be the actual reliance Defendant suggests. "Defendant's proposed but-for standard is stricter even than the standard for common-law fraud— a doctrine presumably consonant with standing doctrine—which requires only that the misrepresentation 'played a substantial part . . . in influencing' the consumer's decision." *Hettinger*, 2025 WL 2029747, at *12 (alteration in original) (quoting *Virginia Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc.*, 878 A.2d 1226, 1238 (D.C. 2005)); *see also Spokeo*, 578 U.S. at 341–42 (looking to suits permitted at common law to inform the standing inquiry).  Here, Plaintiff alleges that the advertised price was "a substantial factor in [her] decision to purchase the . . . tickets." Compl. ¶ 79.  "Even assuming, therefore, that *some* amount of detrimental reliance is necessary for Article III purposes, the Court is satisfied that Plaintiff has shown that she relied in 'substantial part' on Defendant's representations . . . even if she never alleges that she would not have consummated the transaction[] but for those representations."

*Hettinger*, 2025 WL 2029747, at \*12.  That is sufficient for standing on Plaintiff's damages claim.[2]
*Id.*

Plaintiff has not, however, demonstrated standing to seek injunctive relief.  To do so, Plaintiff must allege an "ongoing or future injury that is 'certainly impending'; [s]he may not rest on past injury." *Arpaio*, 797 F.3d at 19 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Plaintiff acknowledges in her complaint that, prior to her filing this lawsuit, the Nationals stopped charging junk fees.  Compl. ¶ 9.  While Plaintiff states that the Nationals still "have not refunded their fans the millions of dollars in Junk Fees that they have been charged," *id.*, that past injury in this case cannot serve as the basis of a claim for prospective injunctive relief.

In response, Plaintiff contends that her claim is not *moot*.  *See* Pl.'s Resp. in Opp'n to Def.'s Mot., ECF No. 19 [hereinafter Pl.'s Opp'n to Def.'s Mot.], at 15 (relying on the "voluntary cessation" doctrine).  But this case does not present a question of mootness; it presents one of standing.  While both "ask whether a case or controversy exists," "[s]tanding poses this question at the time the litigation is commenced, while mootness considers whether the requisite controversy continues to exist throughout the litigation." *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 567–68 (D.D.C. 2018).  Because Plaintiff concedes that Defendant ceased charging junk fees *before* she filed her complaint, the question is whether she has standing to secure prospective relief.  She does not.  *See Valentine v. Wash. Nat'ls Baseball Club, LLC*, No. 22-cv-1299 (TJK), 2023 WL 346099, at \*4 (D.D.C. Jan. 20, 2023).  The court therefore will dismiss Plaintiff's request for injunctive relief.

---

[2] To be sure, *Woodford* seemed to require a more substantial showing of reliance to establish standing.  *See Woodford*, 2023 WL 8083975, at \*5–7.  But "[a] federal trial court decision . . . is relevant only insofar as it has the power to persuade." *In re Shkor*, No. 23-cv-3648 (APM), 2025 WL 3467650, at \*4 (D.D.C. Dec. 3, 2025) (citing *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)).  For purposes of the present case, the court relies on *Hettinger*, in which the standing inquiry was similarly based on allegations of a "bait-and-switch" pricing scheme, rather than *Woodford*, which involved more distinct facts.  *See Woodford*, 2023 WL 8083975, at \*5 (analyzing standing based on allegations of a rideshare company's false representations about compliance with safety requirements).

### B.    NCL's Motion

Satisfied that it has jurisdiction to hear Plaintiff's claim, the court moves to NCL's motion to "intervene as a plaintiff for the limited purpose of requesting a stay, and to stay this litigation." NCL's Mot. at 1.  The court takes each request in turn.

#### 1.    Intervention

NCL seeks to intervene only permissively under Federal Rule of Civil Procedure 24(b). That rule provides in relevant part that "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact" and whose intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).

Neither Plaintiff nor Defendant dispute that NCL's and Plaintiff's complaints present common questions of law and fact, *see* NCL's Mot. at 9; *see* Def.'s Opp'n to NCL's Mot. at 6–10; Pl.'s Opp'n to NCL's Mot. at 5–7, and the court agrees that they do.  Permitting NCL to intervene for a narrow purpose at this early stage of litigation also will not unduly delay the lawsuit or prejudice the parties.  *See In re First Databank Antitr. Litig.*, 205 F.R.D. 408, 414 (D.D.C. 2002). This limited intervention would not, as Defendant fears, "unduly complicate the case" by precipitating "additional briefing and delay[ing] the resolution of the arbitrability motion that is central to this case."  Def.'s Opp'n to NCL's Mot. at 7–8.  Allowing NCL to intervene only with respect to the already-briefed request for a stay requires nothing further with respect to arbitrability or the merits of the case.  To be sure, NCL's ultimate objective—staying the case—would necessarily delay it.  *See* Pl.'s Opp'n to NCL's Mot. at 6–7, 9.  But the court distinguishes the delay from intervention itself from the delay resulting from a meritorious stay.  If a stay is

9

warranted under the governing law, one cannot conclude that any such delay is "undue." The court will therefore permit NCL to intervene for the narrow purpose of asking for a stay.

The parties' remaining counterarguments are unpersuasive. Plaintiff asserts that NCL lacks standing to intervene, *see* Pl.'s Opp'n to NCL's Mot. at 2–6, though she acknowledges that "the D.C. Circuit has not squarely addressed whether permissive intervention, as opposed to intervention as of right, requires a showing of standing," *id.* at 2; *see Scotts Valley Band of Pomo Indians v. Burgum*, No. 25-cv-958 (TNM), 2025 WL 1178598, at \*10 (D.D.C. Apr. 23, 2025) (citing *In re Endangered Species Act Section 4 Deadline Litig.–MDL No. 2165*, 704 F.3d 972, 980 (D.C. Cir. 2013)). But that open question is not implicated here. The D.C. Circuit has stated that when a third party "seeks to intervene only for [a] limited purpose" that "do[es] not ask the district court to exercise jurisdiction over an additional claim on the merits, but rather to exercise a power that it already has," the third party need not demonstrate "an independent jurisdictional basis" for intervention. *EEOC v. Nat'l Child.'s Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998). NCL asks the court to exercise its "inherent power" to stay proceedings, not to issue any ruling on the merits. *See Utah ex rel. Cox v. EPA*, No. 23-1157, 2025 WL 1354371, at \*1 (D.C. Cir. May 2, 2025) (per curiam). So the court need not determine whether NCL has standing to intervene.

Relatedly, NCL is not attempting to engage in so-called "claim-splitting." *See* Def.'s Opp'n to NCL's Mot. at 10. Claim-splitting generally "prohibits duplicative litigation filed before judgment" and therefore requires litigants to assert all claims "arising from a common set of facts in one lawsuit." *See Steele v. United States*, 144 F.4th 316, 324–25 (D.C. Cir. 2025) (internal quotation marks omitted) (applying the rule to cases brought "in the same court"). Defendant accuses NCL of attempting to "seek[] the same relief, related to the same conduct, against the same party" in both D.C. Superior Court and federal district court. Def.'s Opp'n to NCL's Mot. at 10.

10

That is not the case.  NCL seeks to intervene for the limited purpose of seeking a stay; it has not asked to assert a claim.  If anything, NCL is attempting to consolidate all claims related to Defendant's conduct in one court, not split them between two.  The rule against claim-splitting thus does not bar intervention.

Finally, both Plaintiff and Defendant argue that NCL's motion is "premature" because neither this case nor the Superior Court case have reached the class certification stage.  Pl.'s Opp'n to NCL's Mot. at 6; *see also* Def.'s Opp'n to NCL's Mot. at 7–8.  They contend that the court should not address NCL's motion because, prior to NCL being certified to represent a class of affected consumers, "NCL lacks a cognizable interest in this proceeding."  Def.'s Opp'n to NCL's Mot. at 8; *see also* Pl.'s Opp'n to NCL's Mot. at 6.  Perhaps it is true that NCL would have a stronger interest in this litigation if it were a certified class representative.  *See Authors Guild v. Open AI, Inc.*, 345 F.R.D. 585, 590–91 (S.D.N.Y. 2024).  That said, as Plaintiff recognizes, a primary purpose of "discourag[ing] premature intervention" is to avoid "wast[ing] judicial resources."  Pl.'s Opp'n to NCL's Mot. at 6 (quoting *John Doe No. 1 v. Glickman*, 256 F.3d 371, 376 (5th Cir. 2001) (internal quotation marks omitted)).  Instead of kicking both the intervention and stay questions down the line, the court sees it as more efficient to allow NCL to intervene and address the fully briefed stay question now.  *See Nat'l Child.'s Ctr.*, 146 F.3d at 1046 (recognizing the "wide latitude afforded to district courts" in deciding whether to permit intervention).

2.    *Stay*

To support its request for a stay, NCL relies on the *Colorado River* doctrine, which is an exception to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them" that may apply when concurrent state and federal court cases present overlapping issues.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18 (1976);

11

*see* NCL's Mot. at 11–12.  The inquiry is governed by six factors: (1) whether one court first assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the courts obtained jurisdiction over their respective actions; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the parties' interests.  *See Edge Inv., LLC v. District of Columbia*, 927 F.3d 549, 553–54 (D.C. Cir. 2019).  These factors are not a "mechanical checklist" and instead require a "careful balancing" based on the facts at hand.  *Id.*  Whether to abstain is ultimately within the court's discretion, but the court should only do so under "exceptional circumstances."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19 (1983).

The first and second factors—whether one court assumed jurisdiction over property and the inconvenience of the federal forum—are not implicated here.  *See* NCL's Mot. at 13 n.13 (noting that the case "does not involve real property" and that "the federal and local courthouses are within a block of one another and equally convenient for any party").  The court thus considers only whether each of the other four factors is "truly exceptional" such that any or all weigh in favor of a stay.  *Edge Inv.*, 927 F.3d at 554.

*Avoiding Piecemeal Litigation.*  NCL worries that allowing this case to proceed would risk piecemeal litigation between this court and Superior Court.  NCL's Mot. at 15.  It emphasizes that the issues this court would have to address will largely overlap with those being litigated in Superior Court.  *Id.* at 16.  But because Plaintiff "seeks only a subset of the relief" NCL does in Superior Court, if Plaintiff were to prevail here that would still leave "a bizarre assortment of narrow issues" left to resolve in the parallel suit.  *Id.* at 15–16.  To not consolidate litigation in the forum that can provide comprehensive relief, NCL reasons, would waste both courts' resources.  *Id.*  Additionally, NCL cites "the risk of inconsistent rulings if this case is allowed to proceed."

12

NCL's Mot. at 14.  It worries that Defendant is attempting to "get a second bite at the apple" on

disputes it has lost in Superior Court.[3]  *Id.*

But "the mere risk of duplicating efforts and different results is not what the Supreme Court

meant by piecemeal litigation."  *Edge Inv.*, 927 F.2d at 555.  This case is "nothing like" the

"exceptional" risk of piecemeal litigation in *Colorado River*.  *Id.* at 556.  There, the United States

had sued roughly 1,000 water users, while a state court simultaneously adjudicated all federal and

state water rights claims.  424 U.S. at 805–06.  The Court also invoked the "clear federal policy"

of "avoidance of piecemeal adjudication of water rights in a river system" and the legislative

judgment that "recognizes the availability of comprehensive state systems for adjudication of

water rights as the means for achieving these goals."  *Id.* at 819.  Here, without a finite resource

such as water at issue or a comparable statutory directive, this case is more like the "garden-variety

example of two lawsuits proceeding concurrently in two courts."  *Edge Inv.*, 927 F.3d at 556.

Admittedly, there may be some duplication in resolving the cases due to overlap in underlying

facts, legal claims, and parties, but "mere duplication" is not enough and "doctrines of res judicata

and collateral estoppel will substantially mitigate the risk of conflicting results."  *Id.*  NCL doubts

whether these doctrines can provide adequate safeguards here, but it offers no compelling reason

as to why.  *See* NCL's Mot. at 15.  And even though there are some narrow issues that the federal

court litigation may not resolve, that does not "amount to an exceptional circumstance" warranting

abstention.  *Edge Inv.*, 927 F.3d at 556.  In short, there is no "likely" risk of "piecemeal litigation

that is abnormally excessive or deleterious."  *Id.* (internal quotation marks omitted).

---

[3] NCL also suggests Defendant may take advantage of this lawsuit to collude with Plaintiff to reach a more favorable settlement than it may have reached in the Superior Court litigation.  *See* NCL's Mot. at 15.  It is difficult for this court to assess the risk of a collusive settlement at this stage.  That said, Defendant states it is "vigorously defending this case."  Def.'s Opp'n to NCL's Mot. at 9.  And its motion to compel arbitration—the lack of which NCL would have viewed as "strong evidence that any settlement in this case is collusive"—backs up that assertion.  NCL's Mot. at 16 n.15.

*Order of Obtaining Jurisdiction.* NCL filed its Superior Court action approximately 14 months before Plaintiff filed the present case. *See* NCL Compl. (filing date of July 16, 2024); Compl. (filing date of September 5, 2025). This length of time is not remarkable for abstention purposes. *See, e.g.*, *Edge Inv.*, 927 F.3d at 557 (noting the insignificance of a 15-month filing gap). That said, the court must consider not only the length of time, but also "how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21. The Superior Court case is farther along. There, the court has ruled on Defendant's motions to dismiss, stay, and compel arbitration, and the parties have engaged in substantial discovery. *See* NCL's Mot. at 13–14. By contrast, this opinion is the court's first substantive ruling in this case. That said, after publishing this opinion, the court will have ruled on a similar set of motions. *See Colorado River*, 424 U.S. at 820 (noting the "apparent absence of *any* proceedings in the District Court" as support for abstaining (emphasis added)). And both cases are still at relatively early stages, as neither has reached class certification. Moreover, the Superior Court action has been stayed pending appeal of the arbitration issue, so that case remains in limbo and is not likely to progress soon. *See* Stay Order at 4–5. That leaves only the differing progress in discovery, which is not enough to persuade this court that there are "exceptional" circumstances warranting a stay. *See Edge Inv.*, 927 F.3d at 557 ("[T]here is no reason to think that any . . . discovery produced in Superior Court could not also be of use in federal court.").

*Controlling Law.* Both Plaintiff and NCL bring claims under D.C. law. In this District, however, courts regularly adjudicate CPPA claims. *See, e.g.*, *Dorn v. McTigue*, 121 F. Supp. 2d 17 (D.D.C. 2000); *Scott v. Apple Inc.*, 757 F. Supp. 3d 1 (D.D.C. 2024). The presence of state-law issues that "fall within broader categories that are quite familiar to federal courts" is not "exceptional." *Edge Inv.*, 927 F.3d at 559–60.

14

NCL responds that this reasoning "misses the point of this factor entirely."  NCL's Reply in Supp. of NCL's Mot., ECF No. 15 [hereinafter NCL's Reply], at 13.  "The relevant consideration," it says, "is not the competencies of the two courts, but the source of the law that will govern the issues."  *Id.*  But the two go hand-in-hand.  The source of law matters precisely *because* the court must assess whether a stay is warranted based on relative competencies or interests in retaining jurisdiction over the case.  *See Edge Inv.*, 927 F.3d at 559–61.  NCL does not demonstrate why either of those considerations makes this case "exceptionally appropriate for Superior Court adjudication."  *Id.* at 560.  And NCL's contrary framing—asking instead whether "the federal court has [any] particular interest in adjudicating" the question—flips the inquiry on its head.  NCL's Mot. at 17.

The most NCL offers on this score is that "the CPPA reflects specific local policy judgments" regarding public interest organizations' ability to sue on behalf of consumers "that give the Superior Court a particular interest in adjudicating claims like this one."  NCL's Reply at 14; *see also* NCL's Mot. at 18–19.  These policy judgments "would be rendered meaningless," NCL continues, "if, every time a D.C. public interest organization brought suit in the D.C. courts, the defendant could dodge it by turning to litigation in federal court with a new plaintiff willing to copy the original suit and to reach a settlement without the public interest organization."  NCL's Mot. at 18–19.  But this reasoning still does not explain why Superior Court is the "exceptionally appropriate" venue for CPPA claims.  NCL's argument thus does not evince a difference in competencies that warrants this court issuing a stay.[4]

---

[4] In addition to these arguments, both NCL and Plaintiff speculate as to the potential proportions of the class makeup of District versus non-District residents as a reason to favor (or not) Superior Court litigation.  *See* NCL's Mot. at 17–18; Pl.'s Opp'n to NCL's Mot. at 11.  But neither case is yet a certified class action, so the court does not consider those possibilities as part of its decision.

*Protection of Interests*.  The court does not doubt that the Superior Court would adequately protect the parties' interests.  For the reasons already mentioned, however, this factor does not weigh heavily in favor of a stay.  NCL does not explain why this case—which involves a statute with which this court is familiar—is "exceptionally appropriate for Superior Court adjudication." *Edge Inv.*, 927 F.3d at 560.

Ultimately, the *Colorado River* factors do not point to "exceptional circumstances" justifying abstention.  *Moses H. Cone*, 460 U.S. at 19.  The court accordingly denies NCL's request for a stay.

### C.    Arbitration

The court now turns to Defendant's motion to compel arbitration, which is evaluated under the Rule 56 summary judgment standard.  *Aliron Int'l, Inc. v. Cherokee Nation Indus.*, 531 F.3d 863, 865 (D.C. Cir. 2008).  The court will grant the motion if, drawing "all justifiable inferences" in the non-movant's favor, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 255 (1986).

Defendant invokes the arbitration clause that appears in the terms and conditions on both Defendant's website and the Ballpark mobile application.  *See* Def.'s Mem. at 14–16.  The clause provides:

> Any dispute or claim arising out of or relating to this Agreement, or your use of any MLB Digital Property (including all commercial transactions conducted through the MLB Digital Properties), whether based in contract, tort, statute, fraud, misrepresentation, common law, or any other legal theory, ("Dispute") will be resolved through binding individual arbitration.

Def.'s Mot., Ex. A, ECF No. 12-3 [hereinafter Ex. A], at 11.  According to Defendant, both the Nationals' website and the Ballpark mobile application are considered "MLB Digital Properties,"

16

and Plaintiff does not argue otherwise. *See* Def.'s Mem. at 3–4. Defendant states that, because Plaintiff has visited these "MLB Digital Properties" on several occasions, she agreed to their terms of use, including the arbitration provision. *See id.* at 14–17; *see also* Def.'s Reply at 4–5 (asserting that Plaintiff does not challenge its evidence showing that she visited its website and the Ballpark mobile application multiple times).

Defendant's arbitration demand runs aground on a basic principle: "[P]laintiffs are the 'masters of the complaint' with the power to bring [their] claims as they see fit." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 395 (1987)). The court therefore must evaluate a defendant's motion in light of the claim the plaintiff "actually brings." *Id.* Here, Plaintiff does not allege injury based on use of the website. She alleges that she overpaid after being misled at the box office. *See supra* Section III.A; Compl. ¶¶ 74–78. Plaintiff thus does not "actually bring[]" any claims covered by the arbitration agreement—those "arising out of or relating to" her "use of any MLB Digital Property." Ex. A at 11.

Defendant points to various clues within the Complaint to suggest that Plaintiff's claim *might* relate to her use of Defendant's website. Defendant points out, for instance, that when she went to the box office, Plaintiff says that the quoted prices were "consistent with the Nationals' color-coded advertised prices," Compl. ¶ 75, but "Plaintiff's allegations about the location of such color-coded advertised prices point only to *the Nationals' Website*," and "Plaintiff expressly alleged that the Nationals *did not* display ticket prices [prominently] at the box office." Def.'s Reply at 7 (citing Compl. ¶¶ 54, 61, 63). So, Defendant reasons, Plaintiff's false advertising claim must relate to prices she saw advertised on color-coded maps on the website. *Id.* at 6–7. But this supposition is of little, if any, relevance to Plaintiff's actual claim, which is that the stadium box

office added undisclosed fees on top of the quoted ticket price, a fact she only later discovered when checking her credit card statement. She does not assert that the quoted box-office price was greater than what was published online or that the digital disclosures led her to believe that no fees would be added to a box office ticket purchase. Her claim thus does not "aris[e] out of or relat[e] to" her "use of any MLB Digital Property." It therefore is not subject to the arbitration clause.

The court also is unpersuaded by Defendant's argument that Plaintiff's claim must be subject to arbitration "because she seeks to represent a class of all Nationals' online ticket purchasers, in which she is also included." Def.'s Reply at 8; *see also* Def.'s Mem. at 19. Defendant argues that "[b]y bringing a putative class action on behalf of online ticket purchasers, she has put at issue all of her Nationals' ticket purchases, whether or not she included facts related to those online purchases in her Complaint." Def.'s Reply at 8. But once again, Plaintiff is the master of the complaint, and the court must evaluate the arbitrability of Plaintiff's claim based on what she actually alleges. *de Csepel*, 714 F.3d at 598. Whether Plaintiff can adequately represent a class that includes online purchasers is a question for another day. *See* Fed. R. Civ. P. 23(a).

The court therefore denies Defendant's motion to compel arbitration.[5]

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part NCL's Motion to Intervene and to Stay, ECF No. 8. The court permits NCL to intervene for the purpose of seeking a stay but denies the request.

The court also grants in part and denies in part Defendant's Motion to Compel Arbitration or, in the Alternative, to Dismiss the Complaint, ECF No. 12. The court declines to compel

---

[5] Because the court concludes that Plaintiff's allegations do not implicate the arbitration agreement in the first place, the court does not reach the parties' arguments about Defendant's ability to enforce it, *see* Def.'s Mem. at 19–23; whether the contract is illusory, *see* Pl.'s Opp'n to Def.'s Mot. at 19–23; or whether further discovery is warranted, *see id.* at 23–29.

arbitration or dismiss Plaintiff's damages claim.   The court dismisses Plaintiff's request for injunctive relief for lack of standing.

Dated:  April 23, 2026

Amit P. Mehta
United States District Judge